# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| ELEXIA MANZANALEZ, | CASE NO. 3:25-CV-01475-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Elexia Manzanalez challenges the Commissioner of Social Security's decision denying supplemental security income (SSI).[1] (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated July 22, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

On March 24, 2023, Ms. Manzanalez applied for SSI, alleging disability beginning December 1, 2021, due to arthritis, fibromyalgia, severe nerve damage to her spine, cognitive issues, broken ribs, a fractured collarbone, and a shattered right foot. (Tr. 57). After her claim was denied initially and on reconsideration, Ms. Manzanalez requested a hearing before an

---

[1] Ms. Manzanalez also applied for disability insurance benefits, but that application was denied because she had not worked long enough to be eligible and the application was not pursued further administratively or in this court. (*See* Tr. 189, 76; *see also* ECF #1 at PageID 1).

1

administrative law judge. (Tr. 81, 96, 99). On June 5, 2024, Ms. Manzanalez (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 29-54). On July 11, 2024, the ALJ determined Ms. Manzanalez was not disabled. (Tr. 15-24). On May 30, 2025, the Appeals Council denied Ms. Manzanalez's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 416.981). Ms. Manzanalez timely filed this action on July 15, 2025. (ECF #1).

## FACTUAL BACKGROUND

### I.        Personal and Vocational Evidence

Ms. Manzanalez was 32 years old on the claimed disability date and 34 years old at the hearing. (*See* Tr. 57, 29). She completed eleventh grade and has past relevant work experience as a fast-food crew member. (Tr. 232).

### II.        Relevant Medical Evidence[2]

Ms. Manzanalez has been injured in motor vehicle accidents in 2012, 2017, and 2019. (*See* Tr. 306, 339, 530). In 2012, Ms. Manzanalez's right foot was broken, requiring surgery to implant metal fixation plates in her right foot. (Tr. 304; 480). In 2017, she was thrown off her four-wheeler when it overturned and she sustained blows to her head and right foot and lost consciousness. (Tr. 530). In 2019, a drunk driver hit her head on, her airbags deployed, and her head hit the windshield. (Tr. 306, 691). She was hospitalized for a fractured rib and internal bleeding from two cuts in her intestines. (Tr. 663, 674, 693-94). She has experienced chronic back pain ever since. (Tr. 339).

---

[2]        Because SSI benefits are payable as of the month after the month of application, the period at issue in this case begins with April 2023. *See* 20 C.F.R. § 416.335; *Bogle v. Sullivan*, 998 F.2d 342, 346 (6th Cir. 1993). I discuss information from before March 2023 for background purposes.

Ms. Manzanalez has also suffered several falls, including in 2015, 2018, and 2021, that sprained her back and foot. In 2015, she stepped on a toy and fell down the stairs, injuring her right ankle and elbow. (Tr. 486-87). In 2018, she fell from a ladder and sprained several ligaments in her right foot and ankle. (Tr. 701). In 2021, she fell down the stairs and sprained her back and injured her right foot. (Tr. 716-17). Each time, x-rays confirmed the 2012 surgical repair on her right foot was intact. (Tr. 487, 599-600, 714).

Ms. Manzanalez began a new course of care in January 2023 for her chronic problems, including back and abdominal pain. (Tr. 312). She reported feeling unable to move her legs after waking, losing sensation below her belly button, and needing help from family members to get out of bed. (Tr. 314). Her symptoms improved over the day and she would take over-the-counter pain relievers and marijuana for relief. (*Id.*). She also endorsed a history of acid reflux for which she had been prescribed medication but stopped taking. (*Id.*). A physical examination found mid-back pain that was aggravated by walking or extending/flexing the spine and confirmed a loss of sensation to touch throughout the mid and lower back. (*See* Tr. 315). Ms. Manzanalez was prescribed pain medication and referred for imaging and an orthopedist as well as re-prescribed her acid reflux medication. (*Id.*). At a follow-up in February 2023, Ms. Manzanalez reported continued back and abdominal pain for which her prescribed medication provided little relief before wearing off. (Tr. 307). Her updated x-ray imaging was normal. (Tr. 307, 308). She was prescribed new medications and advised to visit the referred orthopedist. (Tr. 308).

Ms. Manzanalez followed up with the orthopedist in March 2023, about three weeks prior to filing her application for SSI. (Tr. 339; *see also* Tr. 57). There, she again endorsed neck and back pain since the 2019 motor vehicle accident and complained she could not move from her shoulder

to the back of her leg after waking. (Tr. 339). Her neck pain radiated into her arms and caused tingling in her arms and intermittent numbness in her fingers, producing difficulty holding things or buttoning buttons. (*See id.*). Her lower-back pain radiated into her legs. (*Id.*). She also complained of chronic pain and numbness in her right foot since the 2012 surgical repair. (*See id.*). She described some temporary relief with prescription pain medications and trigger-point injections. (*Id.*).

A physical examination revealed a normal gait with limited range of motion in the cervical and lumbar spine. (Tr. 340). She had normal strength in her arms and legs but weakness in the intrinsic muscles of her hands and the transverse abdominis (TA) muscles. (*See id.*). Her sensation was generally intact though she had numbness in both thighs and her right fingertips and hypersensitivity at the top of her right foot. (*See id.*). X-ray imaging showed degenerative disc disease in her lumbar spine and maintained disc space height in the cervical spine. (*Id.*). She was diagnosed with disc degeneration at the L5-S1 level, lumbar radiculopathy, cervical pain, and cervical radiculopathy; referred to physical therapy and MRIs; and prescribed a muscle relaxant. (*See* Tr. 340-41).

Throughout March 2023, Ms. Manzanalez attended physical therapy. (Tr. 329, 325, 320). At the first visit, a physical examination revealed pain with lumbar range of motion, limited cervical and hip range of motion, intermittent numbness and tingling in her legs, tenderness to palpation in her shoulders, right antalgic gait, lateral shift in hips, and flexed posture. (*See* Tr. 333). The physical therapist recommended she attend three sessions per week. (Tr. 330). The record documents she attended sessions on March 14 and 20 but does not document the scheduled

March 23 session. (Tr. 325, 320, 322). She did not attend scheduled sessions on March 27 and 30 and she had not scheduled further sessions. (Tr. 402, 400).

In April 2023, Ms. Manzanalez returned to her orthopedist to review the MRIs of her cervical and lumbar spine. (Tr. 337, 345). The lumbar MRI revealed "[s]mall broad-based right foraminal disc herniation and mild-to-moderate degenerative right foraminal narrowing" that contributed "to encroachment exiting right L5 nerve root" and "[l]umbar facet arthropathy with capsulitis" that was a "likely contributing factor to patient's low back pain." (Tr. 346). There was no evidence of other significant lumbar stenosis. (Tr. 337). The cervical MRI revealed "[n]o intrinsic lesion within the cervical spinal cord or compressive discopathy" but a "[l]oss of the cervical lower lordosis" (the curve back in the spine) and no significant central canal or foraminal stenosis. (*See* Tr. 352, 337). Ms. Manzanalez was recommended to "continue with conservative management of her symptoms" and referred to pain management. (Tr. 338).

At a follow-up in April 2023, Ms. Manzanalez reported chronic abdominal pain that "she can bear." (Tr. 465). A physical examination yielded findings similar to January 2023 of mid-back pain aggravated by walking or extending/flexing the spine and a loss of sensation to touch throughout the mid and lower back. (*Compare* Tr. 466 *with* Tr. 315).

Ms. Manzanalez returned to her orthopedist in October 2023 to be cleared for spinal surgery. (Tr. 444). At the time, she was scheduled for a decompression and fusion at her L4-L5 level while under general anesthesia in November. (*Id.*). She reported being generally independent with activities of daily living, as well as being able to climb stairs or hills, walk on ground level at 4 mph, and perform moderate housework. (*Id.*). But she reported symptoms of obstructive sleep apnea with apneic events and severe habitual snoring and that she had not participated in a sleep

study. (*Id.*). Based on that, her orthopedist recommended a sleep study before proceeding with surgery under anesthesia though she was otherwise "generally fit for surgery." (Tr. 445). Later, the surgeon cancelled the surgery because of Ms. Manzanalez's sleep apnea. (Tr. 381, 436).

In November 2023, Ms. Manzanalez visited a pain-management provider on referral from her orthopedist to discuss epidural steroid injections in lieu of surgery. (Tr. 384). She reported a past injection had provided four months' relief. (*Id.*). She also described her treatment history of physical therapy for "6 weeks in the last 6 months" as well as opiate and non-opiate pain medications. (*Id.*). She declined to take gabapentin for pain and was scheduled for an L4-L5 intralaminar epidural steroid injection. (Tr. 385). She underwent the injection later in November. (Tr. 377).

The injections did not provide relief and when Ms. Manzanalez returned to her orthopedist in January 2024, she reported her pain was worse than before the injections. (Tr. 380). A physical examination found tenderness to palpation in the lower lumbar spine over the facets, especially at the L4-L5 level, and in the paraspinal muscles. (Tr. 381). The examiner noted the diffuse muscle tenderness was consistent with a possible fibromyalgia diagnosis, though Ms. Manzanalez was not diagnosed with fibromyalgia. (*Id.*). She was referred to the Cleveland Clinic for an additional surgical evaluation. (Tr. 380). She was prescribed a once-daily narcotic to manage any severe pain in the short term. (*Id.*).

Ms. Manzanalez attended the second spine surgery consultation in April 2024. (Tr. 404). She reported lower-back pain that felt like popping and shocked her whole body, numbness from the base of her neck to her feet, and leg pain worse in her right leg. (*Id.*). Her pain worsened with walking and lifting and she leaned forward while sitting to alleviate pain. (*Id.*). Her ambulation was

6

described as "Independent Community Distances." (Tr. 405). The provider described her treatment history as "conservative" and included pain management and two epidural injections. (Tr. 404). Though she had recently received a CPAP machine for her sleep apnea (Tr. 405), the provider could not make a recommendation on surgery until reviewing Ms. Manzanalez's lumbar MRIs. (Tr. 408). She was advised to continue her current medications during that time. (*Id.*).

### III.     Relevant Opinion Evidence

The state agency consultants at both the initial and reconsideration levels each found insufficient evidence to opine on Ms. Manzanalez's functioning. (*See* Tr. 59-60, 65-66).

### IV.     Relevant Testimonial Evidence

At the hearing, Ms. Manzanalez testified her back will "pop," leaving her without feeling from the waist down. (Tr. 41). She "live[s] on her bed" because of her back condition. (Tr. 37). When her back "pops," she loses feeling in her foot and loses control of her legs. (*Id.*). She cannot sit up straight without her leg and left hand "jolting" and loses feeling in those areas so she always sits leaning forward. (Tr. 38-39). She also struggles to grip things with her non-dominant left hand because of numbness and tingling. (Tr. 38, 35). The longest time she has sat upright is about 10 minutes. (Tr. 39).

Ms. Manzanalez had been on medical leave from her work at Burger King for the previous year. (Tr. 34). She had been on medical leave while awaiting spine surgery. (Tr. 36). Her surgeon has declined to perform the surgery, so she is searching for another surgeon and pursuing additional spinal injections. (Tr. 36, 47). She does not know why her surgery was not recommended. (Tr. 47). The medication she takes for her pain provides some relief. (Tr. 42). She will use the relief to help her children clean the house. (*Id.*). She has received spinal injections

before and they provide one or two months of relief, but wear off after that. (*Id.*). She has tried physical therapy but the sessions left her unable to move for days afterwards. (*Id.*).

Ms. Manzanalez has pins and plates in her right foot after her foot was "shattered" in a car accident, having been broken in ten places. (Tr. 40). The pins and plates were placed in lieu of amputation. (*Id.*). Her foot goes numb at times and she loses feeling of her foot or toes. (*Id.*). The change in sensation occurs without notice making it difficult to walk and often causing falls. (Tr. 40-41).

Ms. Manzanalez suffers abdominal pain after her intestines were injured in a car accident. (Tr. 43). The injury causes abdominal pain and digestion problems requiring daily medication and a varied diet. (Tr. 44). Ms. Manzanalez also has asthma and allergies that cause her to cough. (Tr. 43). They worsen with hot weather. (*Id.*). She uses an inhaler three times a week. (*Id.*).

Ms. Manzanalez is a licensed tattoo artist. (Tr. 44). She has practiced tattoo artistry since age 18 and earned her license the year before the hearing. (Tr. 44). She does not work in a tattoo parlor; instead, she tattoos within the family for experience and not primarily for pay. (Tr. 44-45). The last tattoo she produced was six months prior to the hearing. (Tr. 45). She explained she can tattoo despite her pain because she can sit down and lean forward and use her right hand to control the needle. (*Id.*). She also had a particularly comfortable chair cushion to use while tattooing, but she threw it away to make space in her house. (Tr. 45-46).

Ms. Manzanalez does not have a driver's license. (Tr. 36). On the "very rare" times she has to go somewhere, her neighbor drives her. (*Id.*). She has all her groceries delivered to her. (*Id.*). Her son helps her get out of bed, walk around the house, and do household chores like washing dishes. (Tr. 37-38). Activity including loading the dishwasher or filling a drink from a soda fountain causes

8

her to lose her breath. (Tr. 38, 43). She can scoot herself around her house and clean while sitting down. (Tr. 39-40).

### STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including

9

inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Manzanalez's work after her application did not constitute substantial gainful activity. (Tr. 17-18). At Step Two, the ALJ identified the following severe impairments: obesity, lumbar degenerative disc disease with stenosis, lumbar spondylosis with radiculopathy, asthma, and status post foot fracture. (Tr. 18). At Step Three, the ALJ found Ms. Manzanalez's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 18).

At Step Four, the ALJ determined Ms. Manzanalez's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 416.967(a), except: the claimant can occasionally climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. The claimant can occasionally stoop, kneel, crouch, and crawl. There can be only occasional exposure to atmospheric conditions as rated by the *Dictionary of Occupational Titles* (DOT).

(Tr. 19) (cleaned up). The ALJ concluded Ms. Manzanalez had no past relevant work and so proceeded to Step Five. (Tr. 22). At Step Five, the ALJ determined Ms. Manzanalez could perform other work in the national economy, including as a tattoo artist, inspector, and assembler. (Tr. 23). Thus, the ALJ concluded Ms. Manzanalez was not disabled. (Tr. 23-24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by

10

substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its

11

own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

### DISCUSSION

**I.     The ALJ did not err in evaluating Ms. Manzanalez's subjective statements about her symptoms.**

Initially, Ms. Manzanalez argues the ALJ misevaluated her testimony and erroneously found her "[t]reatment for back pain has been somewhat limited, and the claimant has not had surgery" and her "pain and obesity are adequately accounted for in the residual functional capacity's limitation to sedentary work and postural limitations." (ECF #8 at PageID 809) (quoting Tr. 22). She contends the ALJ overlooked that her surgery was refused because of her sleep apnea and the ALJ did not explain how her statements were inconsistent by using the regulatory factors, instead merely summarizing the evidence without explanation. (ECF #8 at PageID 812). The Commissioner counters that the ALJ compared Ms. Manzanalez's testimony to the objective medical evidence as well as her daily activities and treatment history, and substantial evidence supports the ALJ's application of those factors. (ECF #11 at PageID 831-33).

In evaluating the claimant's subjective reports of symptoms, Social Security Ruling (SSR) 16-3p requires the ALJ to consider the claimant's complaints along with the objective medical

12

evidence, treatment received, daily activities, and other evidence. 2017 WL 5180304, at *5-8 (Oct. 25, 2017). The ALJ also uses the factors outlined in 20 C.F.R. § 416.929(c)(3) to evaluate the claimant's statements:

1. A claimant's daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors but should provide enough assessment to assure a reviewing court that the ALJ considered all relevant evidence and permit the court to "trace the path" of the ALJ's reasoning. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

First, Ms. Manzanalez argues the ALJ erroneously found her "[t]reatment for back pain has been somewhat limited, and the claimant has not had surgery" and then discounted her statements based on the lack of surgery when her surgeon concluded surgery would be too risky. (ECF #8 at PageID 809) (quoting Tr. 22). Under 20 C.F.R. §§ 416.929(c)(3)(iv) and (v), a claimant's medication and non-medication treatment for pain are relevant factors in evaluating a claimant's symptoms. Conservative treatment modalities for a condition, such as non-narcotic pain medication, physical therapy, and non-surgical treatment, can be substantial evidence that the

13

condition is not disabling. *See Ouellette v. Comm'r of Soc. Sec.*, No. 1:25-cv-1841, 2026 WL 787991, at *5 (N.D. Ohio Mar. 20, 2026); *McKenzie v. Comm'r of Soc. Sec.*, 215 F.3d 1327 (table), 2000 WL 687680, at *4 (6th Cir. May 19, 2000) ("Plaintiff's complaints of disabling pain are undermined by his non-aggressive treatment."). But the ALJ should take into account when something outside a claimant's control causes the claimant not to pursue more aggressive treatment. *See Campbell v. Comm'r of Soc. Sec.*, No. 5:21-cv-1780, 2022 WL 10110796, at *10 (N.D. Ohio Oct. 5, 2022) (finding claimant's decision to hold off on injections was not substantial evidence when the claimant was waiting for outside approval), *report and recommendation adopted*, 2022 WL 9997400 (N.D. Ohio Oct. 17, 2022).

The ALJ's finding that Ms. Manzanalez has not had surgery is accurate, though not the whole picture. (*See* Tr. 36, 47). As she points out, she was scheduled to have surgery in 2023, but her surgeon cancelled it due to her untreated sleep apnea and breathing issues posing too great a risk of complication. (*See* Tr. 444-45, 381). The ALJ recognized this, finding "[i]t was noted that the claimant had been offered an L4-5 laminectomy fusion but that had been cancelled due to a new diagnosis of obstructive sleep apnea." (Tr. 21).

But the ALJ also described Ms. Manzanalez's overall treatment was "somewhat limited." (Tr. 22). This is in line with what her own treatment providers described. In April 2023, her orthopedist recommended she "continue with conservative management of her symptoms" and referred her to pain management. (Tr. 338). Then in April 2024 at the second surgical consultation, the provider described her treatment history as "[c]onservative treatments" including "pain management" and "[e]pidural injection x2" that "had improvement for 3.5 months" but she later "had another without relief." (Tr. 404). Then, the provider recommended Ms. Manzanalez

14

continue with her current medications while the provider requested and reviewed her MRIs to decide whether to recommend surgery. (*See* Tr. 408).

Generally, treatment including non-narcotic pain medication, physical therapy, and non-surgical treatment can be substantial evidence that a claimant's treatment is conservative. *See Ouellette*, 2026 WL 787991, at *5. Though Ms. Manzanalez was prescribed a narcotic for severe short-term pain (Tr. 380), her treatment generally included epidural steroid injections (Tr. 385), physical therapy (Tr. 329, 325, 320, 384), and other medications (Tr. 314 (Tylenol, Aleve, and marijuana), 307 (meloxicam), 385 (gabapentin), 339 (Mobic and celecoxib)).[3] Placed alongside Ms. Manzanalez's orthopedist and surgical consultant each describing her treatment as "conservative" (Tr. 338, 404), the record supports the ALJ's characterization of her treatment history as "somewhat limited."

At the same time, the record does not support an inference that Ms. Manzanalez's pain was not disabling because she had not pursued more aggressive treatment. A claimant's lack of surgery does not suggest a non-disabling condition when the claimant is waiting for medical clearance for that surgery. *See Campbell*, 2022 WL 10110796, at *10 (finding claimant's decision to hold off on injections was not substantial evidence when the claimant was waiting for outside approval). Ms. Manzanalez was still pursuing surgery though her sleep apnea made surgery too risky. She

---

[3]     Meloxicam (and its brand-name version Mobic) and celecoxib are nonsteroid anti-inflammatory drugs, the same class of medication as Aleve. *See Meloxicam*, *Medline Plus*, http://medlineplus.gov/druginfo/meds/a601242.html (last accessed June 16, 2026); *Celexocib*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a699022.html (last accessed June 16, 2026); *Naproxen*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a681029.html (last accessed June 16, 2026). Gabapentin is an anticonvulsant that can relieve neuropathic pain by changing the way the body senses pain. *Gabapentin*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a694007.html (last accessed June 16, 2026).

explained to the ALJ she was still searching for a surgeon while also pursuing additional spinal injections. (*See* Tr. 36, 47). The most recent medical records are for a second surgical consultation. (*See* Tr. 408). And Ms. Manzanalez had recently received a CPAP machine for her sleep apnea (Tr. 405), suggesting that condition may controlled enough that she could be cleared for surgery in the future. Thus, the record does not support discounting Ms. Manzanalez's reportedly disabling pain because she had not received surgery.

The ALJ's findings on this factor are not entirely clear. ALJ described Ms. Manzanalez's overall treatment as "somewhat limited." (Tr. 22). But the ALJ also recognized Ms. Manzanalez "had been offered an L4-5 laminectomy fusion but that had been cancelled due to a new diagnosis of obstructive sleep apnea." (Tr. 21). It is not clear from the ALJ's decision whether Ms. Manzanalez's statements were discounted for the lack of surgery. While substantial evidence supports some discounting of her statements under 20 C.F.R. §§ 416.929(c)(3)(iv) and (v) because of the treatment received so far, to the extent the ALJ inferred that Ms. Manzanalez's condition is not disabling because she did not pursue surgery, substantial evidence does not support such an inference.

Whether any error there warrants remand depends on the ALJ's overall analysis of Ms. Manzanalez's statements. Treatment is just one consideration of many, alongside the objective medical evidence, daily activities, and other evidence. *See* SSR 16-3p, 2017 WL 5180304, at *5-8; 20 C.F.R. § 416.929(c)(3). Ms. Manzanalez also argues the ALJ did not explain how her "pain and obesity are adequately accounted for in the residual functional capacity's limitation to sedentary work and postural limitations" by using the regulatory factors but merely summarized the evidence

16

and then issued a one-sentence conclusion. (ECF #8 at PageID 809, 812). The ALJ discussed Ms.

Manzanalez's testimony at the beginning and at the end of the findings for Step Four:

> The claimant alleges disability due to residual effects from a November 2019 car accident, arthritis, fibromyalgia, severe nerve damage to spine, cognitive issues, broken ribs, fractured collarbone, and history of foot injury from 2012 motor vehicle accident. The claimant testified that due to back pain, she spends most of her time in bed. She said she feels she has lost control of her legs. The claimant said her son helps her get out of bed and get to the bathroom. The claimant said she is a tattoo artist but has difficulty gripping with her left hand. The claimant reported endurance of sitting for ten minutes. She said she is only comfortable sitting when she can lean forward. The claimant said she experiences numbness in her right foot related to a prior injury and surgeries. She said her foot pain sometimes causes falls. She said she experiences popping in her back. The claimant said she takes gabapentin and that helps a little. She said she tried physical therapy but found it too painful. The claimant said her asthma is exacerbated by hot weather. She said she uses an inhaler about three times per week. The clamant said she has a knot in her stomach, and this causes some digestive issues. The claimant said she has been doing tattoos since she was 18 and earned her license one year ago. She said she tattoos family members for practice. She said the last tattoo that she drew on someone was six months ago. She said she sits in odd positions while tattooing to stay comfortable.
>
> In her September 2023 function report, the claimant alleged inability to work due to back pain. The claimant reported that she had some difficulties with dressing and bathing and writing. The claimant reported that she could prepare simple foods and could occasionally clean. The clamant reported that she was able to drive but did not go out alone. The claimant reported that she was able to shop weekly and manage her money. The claimant reported that she isolated, did not socialize with others, and had problems getting along with others. The claimant reported endurance of lifting ten pounds, squatting/bending/kneeling one to three minutes, standing fifteen minutes, and walking four to six steps. She alleged issues with memory, completing tasks, and concentrating. She stated that she had problems handling stress and changes in routine.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

* * *

17

In sum, it is found that the record does not provide evidence of any impairment or combination of impairments that render the claimant unable to work. The level of pain and functional impairment alleged by the claimant is not supported by the record. Treatment for back pain has been somewhat limited, and the claimant has not had surgery. She does not use an assistive device to ambulate. It is found that her pain and obesity are adequately accounted for in the residual functional capacity's limitation to sedentary work and postural limitations. There is no updated imaging reflecting any foot abnormalities. The claimant alleged difficulty using her left hand, but there is no related objective evidence in the record. The claimant's asthma appears to be well controlled. No treating source has opined that the claimant is unable to work or suggested any limitations. It is found that the claimant is able to work within the limitations of the residual functional capacity.

(Tr. 19-20, 22) (citations omitted).

Ms. Manzanalez is correct that the ALJ did not mention the factors under SSR 16-3p and 20 C.F.R. § 416.929 by name. But the discussion shows the ALJ considered the relevant factors and explained how the evidence pertinent to those factors was inconsistent with her reportedly disabling pain. To begin, as discussed above, under 20 C.F.R. §§ 416.929(c)(3)(iv) and (v), Ms. Manzanalez's medication and non-medication treatment for her pain are relevant factors to consider but do not control the analysis.

The ALJ also discussed Ms. Manzanalez's symptoms and the impact they have on her daily activities as instructed by 20 C.F.R. §§ 416.929(c)(3)(i) and (ii). At various points in the analysis, the ALJ noted:

The claimant testified that due to back pain, she spends most of her time in bed. She said she feels she has lost control of her legs. The claimant said her son helps her get out of bed and get to the bathroom. The claimant said she is a tattoo artist but has difficulty gripping with her left hand. The claimant reported endurance of sitting for ten minutes.

\* \* \*

The claimant said she has been doing tattoos since she was 18 and earned her license one year ago. She said she tattoos family members for practice. She said the last tattoo that she drew on someone was six months ago. She said she sits in odd positions while tattooing to stay comfortable.

18

* * *

> The claimant reported that she had some difficulties with dressing and bathing and writing. The claimant reported that she could prepare simple foods and could occasionally clean. The clamant reported that she was able to drive but did not go out alone. The claimant reported that she was able to shop weekly and manage her money. The claimant reported that she isolated, did not socialize with others, and had problems getting along with others. The claimant reported endurance of lifting ten pounds, squatting/bending/kneeling one to three minutes, standing fifteen minutes, and walking four to six steps.

(Tr. 19-20). The ALJ later concluded "her pain and obesity are adequately accounted for in the residual functional capacity's limitation to sedentary work and postural limitations." (Tr. 22). The ALJ's limitation to sedentary work is consistent with the self-reported capacity to lift 10 pounds and limited walking and standing as sedentary work involves "lifting no more than 10 pounds at a time" and "walking and standing are required occasionally." *See* 20 C.F.R. § 416.967(a). Consequently, substantial evidence supports the ALJ's discounting of Ms. Manzanalez's statements of a disabling condition to a limited sedentary RFC based on her symptoms and the impact they have on her daily activities under 20 C.F.R. §§ 416.929(c)(3)(i) and (ii). Notably, Ms. Manzanalez's RFC is also consistent with her testimony about becoming a licensed tattoo artist and tattooing while she owned a specialized cushion for pain as the RFC allows working as a tattoo artist as defined by the *Dictionary of Occupational Titles*. (*See* Tr. 44-46, 48-49).

Ms. Manzanalez cites many cases from this district to argue the ALJ's explanation was insufficient as it was more a summary of the record, including supportive and contradictory evidence, and did not explain the ALJ's reasoning. (ECF #8 at PageID 812; ECF #13 at PageID 841-42) (collecting cases). However, many of those cases analyze an ALJ's explanation for whether a medical opinion is persuasive. *See Davis v. Comm'r of Soc. Sec.*, No. 5:20-cv-2807, 2021 WL 6053925, at *9 (N.D. Ohio Nov. 24, 2021), *report and recommendation adopted,* 2021 WL 6051815

19

(N.D. Ohio Dec. 21, 2021); *Matejka v. Comm'r of Soc. Sec.*, No. 1:13-cv-1933, 2014 WL 3197437, at *11-12 (N.D. Ohio July 8, 2014); *Battaglia v. Comm'r of Soc. Sec.*, No. 1:22-cv-1459, 2023 WL 3900356, at *16 (N.D. Ohio June 8, 2023); *Westover v. Comm'r of Soc. Sec.*, No. 4:24-cv-2204, 2025 WL 2611399, at *6 (N.D. Ohio Sept. 9, 2025), *report and recommendation adopted*, 2025 WL 2720743 (N.D. Ohio Sept. 24, 2025); *Steiner v. Comm'r of Soc. Sec.*, No. 5:23-cv-99, 2023 WL 5647254, at *11 (N.D. Ohio Aug. 16, 2023), *report and recommendation adopted*, 2023 WL 5625740 (N.D. Ohio Aug. 31, 2023); *Pica Ortiz v. Comm'r of Soc. Sec.*, No. 1:23-cv-879, 2024 WL 1660131, at *7 (N.D. Ohio Mar. 13, 2024), *report and recommendation adopted*, 2024 WL 1655786 (N.D. Ohio Apr. 17, 2024); *see also Kimberly C. v. Comm'r of Soc. Sec.*, No. 2:20-cv-6059, 2022 WL 336406, at *9 (S.D. Ohio Feb. 4, 2022) (analyzing ALJ's reclassification of the claimant's past relevant work), *report and recommendation adopted*, 2022 WL 541559 (S.D. Ohio Feb. 23, 2022). Importantly, unlike opinion analysis, an ALJ's findings in analyzing a claimant's statements are accorded "special deference." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 788 (6th Cir. 2017). And a reviewing court may not disturb the ALJ's findings on this issue "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, the cases Ms. Manzanalez marshals are distinguishable.

No compelling reason exists to disturb the ALJ's findings here. Though the ALJ could have named the factors expressly and more clearly explained the reasoning for each factor, the ALJ's analysis thoroughly discusses the record and covers multiple regulatory factors. To the extent the ALJ made an unsupported inference in analyzing Ms. Manzanalez's treatment, substantial evidence supports the ALJ's analysis of her symptoms and self-reported daily activities. The court cannot review the evidence and apply the factors de novo, even if the court may have applied the factors differently. *See Brainard*, 889 F.2d at 681. I thus decline to recommend remand on this basis.

20

**II.**     **The ALJ was not obligated to further develop the record by obtaining a medical opinion.**

Second, Ms. Manzanalez argues the ALJ erred in relying on the prior administrative findings and interpreting raw medical data, and instead should have ordered a consultative examination before issuing the RFC. (ECF #8 at PageID 813-14). The Commissioner responds that an RFC does not require a medical opinion and the ALJ is allowed to interpret medical evidence. (ECF #11 at PageID 834-36).

To start, Ms. Manzanalez argues in passing that the ALJ improperly found the prior administrative findings persuasive despite the state agency consultants concluding there was insufficient evidence to render an opinion. (ECF #8 at PageID 814). This argument misreads the ALJ's decision; the ALJ found "these opinions are *not* considered persuasive" for the reasons Ms. Manzanalez argues. (Tr. 22) (emphasis added). Thus, this argument provides no basis for remand.

Next, Ms. Manzanalez argues the ALJ should have obtained a medical opinion before issuing an RFC finding. (ECF #8 at PageID 814). When there is no medical opinion in the record, "an ALJ may make a residual functional capacity finding without a physician's assessment 'where the medical evidence shows relatively little physical impairment' and an ALJ 'can render a commonsense judgment about functional capacity.'" *Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-25, 2011 WL 5024866, at *3 (N.D. Ohio Oct. 21, 2011) (quoting *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)). Yet, the question arises of how "the ALJ could make a detailed RFC finding when the reviewing State agency physicians could not." *Epps v. Comm'r of Soc. Sec.*, No. 1:23-cv-1462, 2024 WL 3184466, at *9 (N.D. Ohio June 4, 2024), *report and recommendation adopted,* 2024 WL 3179664 (N.D. Ohio June 26, 2024); *see also Falkosky v. Comm'r of Soc. Sec.*, No. 1:19-cv-2632, 2020 WL 5423967, at *7 (N.D. Ohio Sept. 10, 2020).

21

The state agency medical consultants determined there was insufficient evidence to opine on Ms. Manzanalez's functioning. (*See* Tr. 59-60, 65-66). The consultant on initial review explained she could not issue an opinion without Ms. Manzanalez completing the form detailing her activities of daily living or her most recent treatment records. (Tr. 59). The consultants on reconsideration review each concluded the additional medical records did not show a worsening or new condition. (Tr. 65). Confusingly, they each concluded "[t]he totality of evidence in file supports the evaluation" on reconsideration, despite neither reaching any conclusions about Ms. Manzanalez's functioning. (*See* Tr. 64-66). Here, unlike the state agency consultants, the ALJ had the benefit of information about Ms. Manzanalez's daily activities from her testimony in the hearing and her function report submitted after the initial review. (*See* Tr. 34-47, 259-62). The ALJ is qualified to analyze a "claimant's own testimony and behavior" about the functional effects of the claimant's symptoms. *See Harris v. Comm'r of Soc. Sec.*, No. 1:14-cv-1213, 2015 WL 4984940, at *2 (N.D. Ohio Aug. 19, 2015). Thus, the ALJ had the missing information the state agency reviewers named as preventing them from issuing their opinions.

Additionally, Ms. Manzanalez argues the ALJ made medical judgments and interpreted raw medical data, yet she does not identify any specific medical judgments made or raw medical data interpreted. A review of the ALJ's decision reveals neither. Though the ALJ referenced x-ray and CT imaging multiple times, each of those imaging studies were already interpreted by a trained medical professional. (Tr. 20-21) (citing Tr. 307, 345-56, 599-600, 663, 670, 714). An ALJ does not interpret raw medical data by discussing imaging that is already read and interpreted by a radiologist. *See Rudd v. Comm'r of Soc. Sec.*, 531 F.App'x 719, 727 (6th Cir. 2013) (x-rays of a claimant's hands and lumbar spine); *Hotain v. Comm'r of Soc. Sec.*, No. 3:17-cv-144, 2018 WL

22

1061192, at *5 (S.D. Ohio Feb. 27, 2018) (MRIs and x-rays). Thus, while the ALJ issued an RFC without a medical opinion, the ALJ did not "play doctor" in doing so by interpreting raw medical data or making medical judgments.

I thus decline to recommend remand on this basis.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: June 16, 2026

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl,* 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health & Hum. Servs.,* 932 F.2d 505, 509 (6th Cir.

23

1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).